CR# 05- 1657-CBS

## AFFIDAVIT OF JAMES T. MARINELLI

I, James T. Marinelli, having been duly sworn, do hereby depose and state as follows:

### INTRODUCTION, BACKGROUND AND QUALIFICATIONS

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed for over seven years. I am currently assigned to the Boston Field Office as a member of the Joint Terrorism Task Force ("JTTF").

2. During my employment at FBI, I have participated in numerous investigations involving violations of the federal criminal laws, including those laws that concern "white collar" crime, as well as those which concern terrorism. I have received extensive training regarding the investigation of these offenses.

3. Since approximately March, 2001, I have been assigned to an international terrorism squad within the JTTF. The JTTF is a task force which includes representatives from a variety of federal, state and local law enforcement agencies, and focuses on counter-terrorism investigations. The squad of which I am a member focuses on international terrorism – that is, terrorism threatened by foreign persons.

4. Based on the facts presented below, I believe that probable cause exists to believe that EMADEDDIN MUNTASSER and others known to the United States have engaged in a scheme to conceal material information from the United States

1

(specifically, the IRS, INS/ICE and the FBI) from at least 1993
to 2003, in violation of 18 U.S.C. §1001(a)(1) and §2; and that
MUNTASSER made false statements to myself and another JTTF agent
regarding a matter within the jurisdiction of the executive
branch of the United States government in April, 2003, in
violation of 18 U.S.C. §1001(a)(2).

5.    The information contained in this affidavit is known to
me based upon personal knowledge or has been told to me by
others, either orally or in writing, who are participating in
this investigation and similar investigations.  This affidavit is
submitted for the limited purpose of obtaining a criminal
complaint charging the offenses outlined herein.  Accordingly, I
have not included each and every fact known to me and to other
agents working in this and related investigations, and have
included only those facts which I believe are necessary to
establish the requisite probable cause.

## FACTS

### A. Overview

6.    The scheme to conceal material information from the
United States began in 1993.  Then, MUNTASSER formed Care
International, a purported Muslim charitable organization.
MUNTASSER lied when he obtained tax-exempt status for Care from
the IRS when he represented that Care was not an outgrowth of, or
successor to, any other organization.  In fact, Care was an

2

outgrowth of, and successor to, the Al Kifah Refugee Center branch in Boston, another purported Muslim charity. Al Kifah was based in New York City (after September 11, 2001, Makhtab Al-Khidamat/Al Kifah was later designated as an organization supporting terrorism because of its involvement in the 1993 World Trade Center bombing ). In Boston, Al Kifah published a newsletter, "Al-Hussam" (an Arabic term meaning "the Sword"), which actively advocated for "jihad," or holy war, involving "mujahideen," or Islamic holy warriors. While under MUNTASSER's leadership, Care assumed publication of Al Hussam. From 1993 to at least 2001, MUNTASSER and others operated Care in the same manner as Al Kifah by publishing Al-Hussam and/or soliciting money for mujahideen and jihad through mail and wire solicitations. Despite this, MUNTASSER and others filed with the IRS required Form 990 disclosures which omitted required material information that would have shown that Care was Al Kifah's operational successor and was itself engaged in supporting mujahideen and jihad. This was a fraud both on the United States, through the IRS, and on the gift-giving public.

7. MUNTASSER continued to conceal these facts regarding his involvement in Al Kifah and Care and facts regarding Care's operations from the INS (now ICE) and/or the FBI. In October, 2002, MUNTASSER filed an Application for Naturalization with the INS and failed to list his association with either Care or Al

3

Kifah.  In addition, MUNTASSER did not disclose that he had traveled to Afghanistan, as required by the immigration application.  Another JTTF agent and I interviewed MUNTASSER in April, 2003.  MUNTASSER lied when he stated that Care served humanitarian purposes, further concealing its solicitation and support for jihad and mujahideen, and when he denied that he had traveled to Afghanistan.  In fact, MUNTASSER had traveled to Afghanistan in 1994-95, and did so in furtherance of Care's activities.  Through these acts, MUNTASSER deprived the United States of information to which it was entitled to perform its lawful functions from 1993 to 2003.

**B.  Detailed Facts**

8.  In 2003, Suheil Laher, then president of Care, was interviewed by the JTTF.  Laher stated that the Al Kifah Refugee Center existed in Boston in the early 1990's.  Laher stated that the Al Kifah office in Boston disliked the fact that Al Kifah in New York was linked to the 1993 attack.  Therefore, Care was incorporated in 1993 as a separate organization, and the officers of Al Kifah Boston carried over and became officers of Care.

9.  In 1993, MUNTASSER founded and organized Care. MUNTASSER represented in Care's Articles of Incorporation, filed with the Massachusetts' Secretary of State's Office, that Care was "organized exclusively for charitable, religious, educational and scientific purposes . . ."

4

10.    Shortly after Care was incorporated in Massachusetts, MUNTASSER sought a tax exemption from the Internal Revenue Service ("IRS") pursuant to 26 U.S.C. § 501(c)(3) on the basis that Care was a charitable organization.[1]  Specifically, on or about June 1, 1993, MUNTASSER, on behalf of Care, filed IRS Form 1023, "Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code" (hereinafter, "the 1023 application").  MUNTASSER signed the form under the pains and penalties of perjury that the "application, including the accompanying schedules and attachments, ... to the best of my knowledge [are] true, correct and complete."  MUNTASSER stated that Care was recently incorporated, would become operational shortly, and would provide services such as "provid[ing] assistance to victims of natural and man-made disasters ... primarily in Bosnia and later in African countries. ... [and] develop[ing] a program for orphan sponsorships."  Attached to this application were copies of Care's Articles of Incorporation and By-Laws.  Nowhere did MUNTASSER disclose an intention for Care to support jihad or mujahideen or to solicit contributions or distribute publications supporting jihad or mujahideen.

12.    In the 1023 application, MUNTASSER answered "no" to the

---

[1] To qualify for exemption under §501(c)(3), an entity must be organized and operated exclusively for exempt purposes; any non-exempt purpose must be incidental and not substantial to its operation.  26 C.F.R. §1.501(c)(3)1(c)(1).

5

question "[i]s the organization the outgrowth of (or successor to) another organization, or does it have a special relationship with another organization by reason of interlocking directorates or other factors? ... If ... answered "Yes,", explain." Nowhere did MUNTASSER disclose Care's relationship with Al Kifah.

13.  Several issues of Care's newsletter, Al-Hussam, were seized as part of this investigation.  They reflect dates from 1992 to 1997.  Some of the oldest versions were denoted as the newsletter of Al Kifah Refugee Center.  Later-dated issues indicate that Al-Hussam was the newsletter of Care.

14.  When Care filed its articles of incorporation in or about April, 1993, Care's street address was listed as 1085 Commonwealth Avenue, Suite 124, Boston, Massachusetts, 02215.  I have reviewed a document purporting to be a September, 1992 edition of Al-Hussam seized during one of the Care searches.  It reflects that it was "Newsletter of Alkifah Refugee Center - USA, 1085 Commonwealth Avenue, Suite 124, Boston, Massachusetts," the same address as Care used in its articles of incorporation.  That publication contained a passage from Abdullah Azzam discussing his pride in the jihad in Afghanistan.  Later copies of Al-Hussam reflected that Al-Hussam was "the newsletter of Care International."

6

15.    The main theme of the Al-Hussam newsletters was jihad.[2]
Each issue follows essentially the same format, with a current
events section detailing the activities and victories of
mujahideen in places such as Bosnia, Algeria, Libya and Chechnya,
and criticizing anti-Islamic actions by the governments of Saudi
Arabia and Egypt.  Most space was reserved for long quotations or
interviews by various Islamic scholars on the topic of jihad.

16.    Azzam authored "Join the Caravan," which was published
in English by Care.[3]  Join the Caravan states that "[t]he
obligation of *jihad* today remains [individually required] until
every last piece of land, which was in the hands of Muslims, but
has been occupied by the disbelievers, is liberated."

17.    Other Al-Hussam newsletters published by Care included
support for jihad.

18.    In 2003, Laher and Mohamed Mubayyid, then the treasurer
of Care, produced Care records pursuant to a Grand Jury subpoena.
Several documents reflect Care's solicitation for funds to
support mujahideen and jihad.  Among the documents was a pamphlet

---

[2] Despite this consistency in viewpoint expressed in Al-
Hussam, they also include a disclaimer stating that the articles
"represent the views of the authors ... [and] do not necessarily
represent the views of Care International."

[3] In my interview of MUNTASSER in 2003, MUNTASSER said Azzam
was one of the leading figures in Afghanistan who fought the
Russians, and who claimed that people should help the Afghans
until the Russians were defeated.  MUNTASSER further stated that
Azzam wrote "Join the Caravan", which MUNTASSER stated was
strongly worded.

which provided the address for Care as 510 Commonwealth Avenue, #275, the former Al Kifah address. According to its tax filings, Care used this address from 1993 through 1996. The pamphlet described Care as follows:

> Care is a non-profit organization founded by Imam Abdullah Azzam to provide services to war victims and refugees around the world.

The pamphlet's identifying Azzam as the founder of Care – and not MUNTASSER – again suggests that Care was Al Kifah's successor and supported jihad and mujahideen. The pamphlet, however, went on to say:

> We call upon the faith of the Muslim Ummah to assist fellow Muslim Brothers and Sisters defend their lives, honor and religion. ... A biweekly newsletter, **Al-Hussam,** brings you news and comments from around the world. It relies on authentic Mujahideen sources and is published in Arabic and English. In addition, it contains vital information about how you can help with current projects.

The pamphlet also states, in bolded italics, "All contributions are tax deductible."

19. MUNTASSER and the others who ran Care also solicited and collected money for "zakat", a mandatory Muslim obligation of providing a percentage of an individual's assets to charity. In Care's solicitations for zakat, donors were advised that part of their zakat had to be donated to mujahideen, who were identified as one of eight categories of eligible recipients. The solicitation also stated that all donations are tax deductible.

8

Another Care Zakat guide (bearing the date "1/26/94 12:16 AM")
identified "*Mujahideen:* Those who are going out for Jihad,
fighting in the path of Allah" as recipients of zakat, and added
that "Zakat has to go EQUALLY to ALL the available categories.
Therefore, it is imperative that you give part of your Zakat to
Mujahideen. ... Therefore, we urge you to send us your Zakat
money for proper distribution." The form provided Care's address
and telephone number, and noted in bold "All Donations Are Tax
Exempt."

20. In addition to the Zakat guide, other documents were
seized during this investigation showed that Care expressly
solicited money to support orphans of those killed fighting
jihad, thus supporting the jihad. One undated document appears
to be a solicitation flier. It is entitled "Care International"
and bears photographs of children. It states:

> Do you know who I am? I am an orphan whose
> father died in defense of the faith.
>
> O seeker of reward from Allah: Won't you
> sponsor me, so that on the day of Judgment
> you may be with the Prophet ...? Won't you
> sponsor me, and fulfill part of your
> obligation to my father?
>
> ...
>
> We, at Care International, ... [i]n order to
> fulfill the rights due to our brothers, we
> have taken upon ourselves the responsibility
> to take Care of and sponsor their orphan
> children ...We hope to cover their needs, so
> that they can devote themselves to learning
> and worship, and grow up to be defenders of

9

the Faith and revisers of our glorious past.

Brother and sister!  We invite and encourage
you to participate in this act of worship.
Come forward and perform this good deed, and
do not delay.

The flier provides the name of "Care International," along with a
telephone and fax number and website address.

21.   Bank records reflect MUNTASSER'S role in Al Kifah and
its connection to an entity known as the Human Services Office.
The "Services Office" is believed to be a name used for the Human
Services Office (HSO), also known as Makhtab al Khidamat ("the
Services Office" in English).[4]  Between March, 1992 and March,
1993, MUNTASSER wrote checks to Al Kifah totaling more than
$29,000.  On April 20, 1993, MUNTASSER wrote a personal check
drawn to Care for $10,000, with the memo stating "new acct."[5]

22.   On August 6, 1993, MUNTASSER made a withdrawal from an

---

[4] Shortly after September 11, 2001, the Treasury Department
designated "Makhtab Al-Khidamat/Al Kifah" as a Specially
Designated National and Blocked Person as a terrorist supporter
for its facilitating Bin Ladin and participating in the 1993
World Trade Center attack.

[5] Seized banking documents further reflect the connection
among MUNTASSER, Care and Al Kifah.  Al Kifah banking documents
concerning automatic credit transactions for January, February,
April, August, September, October, November and December, 1993
for "Alkifah Refugee Center, 2 Kimball Ct. #109, Woburn, Ma,"
bore the address 2 Kimball Court, No. 109, which was MUNTASSER's
home address.  The company contact and "authorized signer" for Al
Kifah is listed as "E. MUNTASSER."  MUNTASSER is also identified
as one of the people providing automatic payments to Al Kifah.
For the October, November and December packages, the fax sender
information reads "Care International, Boston."

Al Kifah BayBank account of $10,000 on behalf of Al Kifah Refugee
Ctr., and on the same day received a BayBank bank check, which
appears to have been drawn from the Al Kifah account, in the
amount of $10,000.  That check was made out to the "Services
Office."

23.   On October 8, 1993, MUNTASSER made a withdrawal from
Care's BayBank account in the amount of $34,392.38.  A BayBank
bank check was issued on the same day in that amount, made out to
"Human Service Office."  On that same day, MUNTASSER authorized a
withdrawal from the Al Kifah BayBank account of $1,623.33.  A
BayBank bank check in that amount was issued on that same day to
"Human Service Offices."[6]

24.   From August 1993, to June 1995, MUNTASSER, in the name
of Care or Al Kifah, wire transferred nearly $167,000 to the
Human Service Office (or variations on that name) in Bosnia.
These transfers are summarized as follows:

| DATE | MAKER | RECIPIENT | AMOUNT |
|------|-------|-----------|--------|
| 8/6/93 | Al Kifah | Services Office | $10,000.00 |
| 10/8/93 | Care | Human Service Office | $34,392.38 |
| 10/8/93 | Al Kifah | Human Service Office | $ 1,623.33 |
| 10/13/93 | Care | Services Office Bosnia I Herzego- | $ 1,000.00 |
| 10/15/93 | Care | Human Services Office | $15,000.00 |

---

[6] The last word in the title, "Office," is partially typed
over.

11

| 11/4/93 | Care | Human Service Office Bosnia | $36,063.44 |
| 3/8/94 | Care | Human Services Office Bosnia | $47,972.00 |
| 8/17/94 | Care | Human Services Office Bosnia | $ 8,815.51 |
| 6/21/95 | Care | Human Svcs Ofc. Bosnia I Herzegovina | $12,011.06 |

25.   In addition to these outflows, Care and Al Kifah received checks from donors directed to support jihad and mujahideen.  Care's files reflect a 1993 check in the amount of $230 written to Al Kifah by an individual named Kubilay Celebi. The memo line reflects that the check was for "Bosnia mujahideen."  Another March, 1993, check written to Al Kifah in the amount of $100 reflected "jihad" on the memo line.  A June, 1993, check for $1400 written to Care bore the memo "Bosnia Halil one mujahid."  Four others, ranging from $50 to $500, were made out to Care "for Jihad only;" "Mujahideen of Bosnia;" "Bosnia Jihad fund;" or "Chechen Muslim Fighters."  At least one document reflects that Care's contributions to another charity were used to support mujahideen.  A receipt from the Meheira Charity Association dated March 2, 1998 lists among the recipient of $1000 from Care for those "in the cause of Allah," a phrase I believe refers to mujahideen.

26.   As a §501(c)(3) organization, Care was required to annually file Form 990 tax returns with the IRS.  Like the

12

application for tax exempt status, Care was required to list on these returns its primary exempt purpose and also describe its exempt purpose achievements, including "the number of clients served, publications issued, etc." Care's Forms 990 for the years 1994-2003, signed under the penalty of perjury by Care officers, including MUNTASSER (who served as President from on or about 1993-1996) and others continued to represent that Care's activities were exclusively charitable consisting of, among other things, providing financial assistance to orphans and widows, food distribution, and providing grants to other welfare organizations. In no tax return did Care disclose that it had solicited funds to support jihad or issued any publications.

27. Unbeknownst to the IRS, the statements in Care's tax filings, its initial application for §501(c)(3) tax exempt status and subsequent Form 990 tax returns, were materially incomplete and false. Specifically, MUNTASSER and the others who ran Care solicited and expended tax deductible donations to finance several activities that promoted and supported "mujahideen," or Muslim holy warriors, engaged in "jihad," or violent, religiously-based military conflict, including killing, overseas. These non-charitable activities were not disclosed to the IRS.

28. Prior to September 11, 2001, Care's website, www.care-intl.org, contained direct solicitations for tax deductible donations to support the mujahideen. As described in detail

13

below, the website provided updates on military operations involving the mujahideen and solicited funds to support those operations.  Care's website also contained articles from the Al-Hussam newsletter and provided links to other web pages, which made clear that support of the mujahideen was required of all Muslims.

29.  Over the years 1993 to 2003, Care collected approximately $1.3 million dollars in contributions, the majority of which represented zakat.  Upon receipt of donations, Care provided a receipt documenting the amount of their tax deductible donation that could be used for tax purposes.  It is unclear what part, if any, of these donations went to mujahideen. However, as detailed herein, Care sent tens of thousands of dollars to the Human Services Office.  Moreover, Care also collected money that was specifically directed toward mujahideen.  Several checks deposited by Care contained the words "jihad" or "mujahideen" in the memo section.

30.  On October 21, 2002, MUNTASSER filed an Application for Naturalization (Form N-400)("INS Application") with the Immigration and Naturalization Service.  MUNTASSER signed the INS application on October 18, 2002 and thereby certified that "under penalty of perjury under the laws of the United States of America, that this application, and the evidence submitted with it, are all true and correct."  This application requested, among

14

other things, information about MUNTASSER's trips outside of the United States since he became a lawful permanent resident and membership or affiliations with any organizations. MUNTASSER's responses to these requests were materially false and misleading.

31. Specifically, subsection C of Part 6 of the INS application instructed MUNTASSER to "List below all the trips of 24 hours or more that you have taken outside of the United States since becoming a Lawful Permanent Resident."[7] In response, MUNTASSER identified trips he took from February 2001 to October 2002. MUNTASSER did not list any trips prior to April 11, 1999. MUNTASSER did not disclose a thirty-day trip he took to Pakistan and Afghanistan in approximately December 1994 to January 1995.

32. Question 8 of Subsection B of Part 10 of the INS application asked MUNTASSER:

Have you EVER been a member of or associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other place?

MUNTASSER responded "No" to this question, and did not disclose his involvement in Care or Al Kifah.

33. Another JTTF agent and I interviewed MUNTASSER on or about April 7, 2003. While he attended college, MUNTASSER began to volunteer for Al Kifah (the Al Kifah Refugee Center is discussed in more detail below). MUNTASSER denied that Al Kifah

_____

[7] MUNTASSER became a lawful permanent resident on September 21, 1992.

15

changed its name to Care International, Inc., because Al Kifah was linked to the 1993 World Trade Center bombing. MUNTASSER stated that he did not know that Al Kifah had anything to do with the 1993 attack. MUNTASSER stated that the name was changed to Care because MUNTASSER was unable to obtain copies of appropriate tax records from Al Kifah in New York. MUNTASSER stated later in the interview that Care and Al Kifah were separate organizations. MUNTASSER stated that Care was established after Al Kifah was dissolved, but added that both organizations had the same basic mission, used the same address (on Commonwealth Avenue in Boston), and had some common officers.

34. MUNTASSER claimed that he was not the president or other officer of Al Kifah because it was not registered in Massachusetts. MUNTASSER also stated that Al Kifah was a branch of the larger organization in New York.

35. MUNTASSER stated that Care was formed six to seven years previously. MUNTASSER served as president for the first "couple of years." MUNTASSER stated that Care was registered in Massachusetts, and served "humanitarian" purposes such as orphan sponsorship, supporting vocational schools in several countries, and sponsoring a program which provided an alternative means of employment for those who had been injured in the Soviet-Afghan war (for example, one program taught veterans how to make shoes). MUNTASSER did not disclose that Care solicited for and supported

16

jihad and mujahideen.

36.   MUNTASSER stated that in 1994, he traveled alone to Peshawar, Pakistan, for the purpose of verifying the humanitarian causes to which Care's donations had been directed.   MUNTASSER stated he also investigated the possibility of starting an import business to bring local craft items from Peshawar (rugs, leather goods) to sell in the United States.   More than once, MUNTASSER denied ever traveling to Afghanistan.[8]

37.   Later in the 2003 FBI Interview, MUNTASSER reiterated that he traveled alone to Peshawar, and reiterated that he never traveled to Afghanistan.   When pressed on the issue of travel to Afghanistan, MUNTASSER requested to consult with an attorney, and agreed to answer questions except those regarding travel to Afghanistan.

38.   After the 2003 FBI Interview, MUNTASSER admitted that certain material statements he had previously made to ICE were false.   On November 6, 2003, Alton Saucier ("Saucier") of ICE interviewed MUNTASSER about his Application for Naturalization. At this interview, MUNTASSER's lawyer provided Saucier with

---

[8] On April 6, 1999, MUNTASSER spoke with another JTTF agent. At that time, MUNTASSER stated that Care was a charitable organization designed to aid Afghan war victims, among others. MUNTASSER stated that in 1994 or 1995, MUNTASSER traveled to Pakistan to visit factories where Afghan refugees, mostly handicapped children, were working making rugs and leather goods which MUNTASSER claimed he tried to market in the United States with little or no success.

further foreign travel which MUNTASSER had omitted from his
original application. This list included seven trips between
March 1993 and November 1997, and indicated that MUNTASSER had
traveled to Pakistan and Afghanistan from approximately December
28, 1994 to January 29, 1995 for a period of thirty days, none of
which had been disclosed on MUNTASSER's application. Saucier
questioned MUNTASSER about the accuracy of this list. MUNTASSER
verbally confirmed that he in fact had traveled to Afghanistan
and Pakistan.

39. At this interview, MUNTASSER's lawyer also provided
Saucier with a list of MUNTASSER's memberships in eleven
organizations in the United States from 1981 to 2002, including
Care and Alkifah Refugee Center from 1993-1996, in direct
contradiction to the answer in the application he signed on
October 18, 2002. During the interview on November 6, 2003,
Saucier asked MUNTASSER whether he had ever been a member of any
organization, and he then answered "yes."

40. On April 6, 2004, John Fernandez, an officer of INS
(now known as ICE) interviewed and obtained a sworn statement
from MUNTASSER regarding his Application for Admission into the
United States. Among other things, MUNTASSER stated made the
following statements:

    a.    He traveled to Pakistan and Afghanistan in the winter
           of 1994.

    b.    He was President of Care International and belonged to

18

this organization until 1995-1996.

c.   His trip to Pakistan and Afghanistan was related to his
     "humanitarian work" for Care.  MUNTASSER indicated that
     while in Afghanistan he "visited orphanages, schools
     and places where they make handcraft."

d.   MUNTASSER described the humanitarian work he did with
     Care as: "[o]rphan sponsorships, we tried to bring some
     donations and we thought of bringing their handcrafted
     goods to the U.S. to sell them but it did not work."

## CONCLUSION

41.  Based upon the above, and on my training and
experience, I have probable cause to believe, and do in fact
believe, that EMADEDDIN MUNTASSER and others known to the United
States have engaged in a scheme to conceal material information
from the United States (specifically, the IRS, INS/ICE and the
FBI) from at least 1993 to 2003, in violation of 18 U.S.C.
§1001(a)(1) and §2; and that MUNTASSER made material false
statements to myself and another JTTF agent in April, 2003, in
violation of 18 U.S.C. §1001(a)(2).


                              JAMES T. MARINELLI
                              Special Agent
                              Federal Bureau of Investigation

    Sworn to me and subscribed in my presence this    day of
April, 2005.

                              CHARLES B. SWARTWOOD, III
                              Chief United States Magistrate
                              Judge

20

JS 45 (5/97) - (Revised USAO MA 3/25/02)

**Criminal Case Cover Sheet**                    **U.S. District Court - District of Massachusetts**

**Place of Offense:**                    **Category No.** II          **Investigating Agency** FBI

City    Boston and elsewhere            **Related Case Information:**

County    Suffolk and elsewhere          Superseding Ind./ Inf.    None          Case No. 05 – 1657-CBS
                                          Same Defendant _____    New Defendant _____
                                          Magistrate Judge Case Number _____
                                          Search Warrant Case Number    03-M-1028 and 1029-JGD
                                          R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name    Emadeddin Muntasser                    Juvenile    ☐ Yes    ☒ No

Alias Name _____

Address _____

Birth date: 12/10/64    SS#: 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    Sex: M    Race: _____    Nationality: Libya

**Defense Counsel if known:**    Norman Zalkind          **Address:** 65a Atlantic Avenue
                                                                      Boston, MA
**Bar Number:** _____

**U.S. Attorney Information:**

**AUSA**    Michael Ricciuti/Stephanie Siegmann          **Bar Number if applicable** _____

**Interpreter:**    ☐ Yes    ☒ No          **List language and/or dialect:** _____

**Matter to be SEALED:**    ☒ Yes    ☐ No

          ☐ Warrant Requested          ☐ Regular Process          ☐ In Custody

**Location Status:**

**Arrest Date:**    None

☐ Already in Federal Custody as _____ in _____
☐ Already in State Custody _____    ☐ Serving Sentence    ☐ Awaiting Trial
☐ On Pretrial Release:    Ordered by _____ on _____

**Charging Document:**    ☒ Complaint    ☐ Information          ☐ Indictment

**Total # of Counts:**    ☐ Petty _____    ☐ Misdemeanor _____    ☒ 2 Felony _____

**Continue on Page 2 for Entry of U.S.C. Citations**

☒        I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
         accurately set forth above.

**Date:** 4/6/05          **Signature of AUSA:**

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

**District Court Case Number  (To be filled in by deputy clerk):** _____

**Name of Defendant**     Emadeddin Muntasser _____

### U.S.C. Citations

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1  18 USC 1001(a)(1) | False Statements Scheme | 1 |
| Set 2  18 USC 2 | Aiding and Abetting | 1 |
| Set 3  18 USC 1001(a)(2) | False Statements | 2 |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:** _____